IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| PENNSYLVANIA ELECTRIC COIL, LTD., | Case No. 4:06CV00080 |
| Plaintiff, | |
| | **MEMORANDUM OPINION** |
| v. | |
| CITY OF DANVILLE, | By: Jackson L. Kiser |
| | Senior United States District Judge |
| Defendant. | |

Before me is Defendant City of Danville's Motion for Summary Judgment (the "Motion"). For the reasons stated herein, the Motion will be granted in part.

I.  STATEMENT OF FACTS

The primary issue in this case is whether certain work done by Pennsylvania Electric Coil ("PEC") is part of a contract between it and the City of Danville ("the City" or "Danville"). The parties entered into a fixed-price contract for $882,000 ("Contract") which required PEC to disassemble, rewind, refurbish, and reassemble three hydroelectric generating units. (Def. Mem. 1.) The primary work in dispute here is the alignment of those units. These units are part of the Pinnacles Hydro Station on the Dan River, which supplies power to Danville. (*Id.* at 2.)

Danville issued an Invitation for Bids ("IFB") along with technical specifications developed by Danville's engineer, Devine Tarbell & Associates ("DTA"). (*Id.* at 3.) PEC's bid of $882,000 was the lowest and Danville awarded the contract to PEC. (*Id.* at 4–5.) Danville and PEC entered into the Contract in August 2003. (*Id.* at 5.) The Contract included: 1) a four page agreement, 2) the IFB with technical specifications, 3) PEC's proposal, 4) Danville's requirements and instructions for bidding, 5) Danville's procurement code, and 6) bond and

1

insurance documents.  (*Id.*)

Article Seven of the Contract required any increases to the $882,000 fixed-price to be in writing approved by Danville officials.  (*Id.*)  Further, price increases of the Contract were limited to a 25% cap, as imposed by Virginia Code § 2.2-4309.  (*Id.* at 5–6.)  The scope of the project included disassembly, refurbishment, and reassembly of the generator units ("Units").

Section 3.2 of IFB §15100, regarding "Disassembly," states: "Where match marks and dowel pins do not exist, [PEC] is responsible for match marking and dowel pinning so that the unit can be assembled to the existing alignment and plumb condition."  (*Id.* at 16.)  Subsection 3.4.4 of IFB § 15100 (which is part of the Contract), labeled "Unit Alignment," demands that runout at the guide bearings and couplings, static shaft runout, shaft plumb, and guide bearing concentricity to be within specified tolerances upon assembly.  (*Id.* at 6–7.)

PEC warranted that it inspected the site and equipment, was familiar with the work, and satisfied that the bid was accurate.  (*Id.* at 7–8.)  Article 8.e of the Contract also calls for PEC to "bear all losses resulting from the amount or character of the work being different . . from what was expected."  (*Id.* at 8.)

The Contract also required PEC to seek a resolution of any inconsistencies in the Contract with Danville's engineer, and to obtain written interpretation from that engineer.  (*Id.* at 8–9.)  Further, authority to modify the Contract or purchase orders was solely with the Director of Purchasing, and any purchases contrary to these provisions were to be void.  (*Id.* at 9.)

The parties did execute several modifications, or "Change Orders," to the Contract: Change Order I:  PEC performed a heat run test on Unit I before disassembly for $17,500.  (*Id.* at 9–10.)  Change Order II:  PEC recommended three changes to the Contract as a result of the uprate study.  (*Id.* at 10.)  Danville approved two of these changes for $61,240, and later paid for

2

the third.  Change Order III:  PEC recommended repair of certain parts of Unit I, and Danville agreed, paying $23,065.  (*Id.*)

A new supervisor, Mark Wenckus ("Wenckus"), took control of the project for PEC in January 2005.  (Pl. Opp. 12.)  This was after partial disassembly, but before the alignment issues in question.  (*Id.* at 12–13.)  He met with Philip Slate ("Slate"), a Danville supervisor, and kept him fully advised of the updates during the project.  (*Id.* at 13.)  Slate's office was in the powerhouse.  (*Id.*)

When Wenckus reviewed the specifications, he found that the work was inaccurately described, could not be accomplished as specified, and was contrary to industry standards, especially where they called for the Units to be assembled to the existing alignment and plumb condition.  (*Id.* at 13–14.)  He modified the plans and discussed the differences with DTA, Slate, and Brad Child ("Child"), PEC's representative.  (*Id.* at 14.)

During reassembly, PEC aligned Unit 1.  This was complete by February 2, 2005, and PEC submitted its measurements.  (Def. Br. 11.)  Unit 1 complied with the alignment requirements of the Contract.  (*Id.*)  As Danville states in their Motion, "While there were discussions as to whether the alignment work was extra or not during January, no proposals for change orders were submitted, no change orders or modifications of the Contract were issued, and no written requests were submitted to the engineer for an interpretation of the Contract requirements."  (*Id.*)

According to PEC, in early April 2005, Wenckus mentioned to Slate his concerns about the disputed work, and that he did not want to have to stop work.  (Pl. Opp. 17.)  Slate told him that he did not want that to happen and said he was sure that all issues relating to the disputed work would be cleared up.  (*Id.*)  A similar conversation occurred in the middle of April, when

3

the sole plate for Unit 2 was being worked on. (*Id.*)

Unit 3 was returned to the Pinnacles in early April and alignment was completed in early May. (Def. Br. 11–12.) Again, PEC completed the work without any change order requests, modification requests, or written requests to the engineer. (*Id.* at 12.) In April, PEC submitted one proposal for concrete repairs to the sole plate of Unit 3 in the amount of $4,750, and another for $2000 for alignment of the stator and sole plate on Unit 3. (*Id.*) The parties disagree as to whether these modifications were accepted, but Danville never approved them in writing.

Wenckus had been trying to meet with Danville representatives for a while. (Pl. Opp. 18.) On May 6, 2005, he advised Gary Via, Director of Danville's Purchasing Department, that Units 2 and 3 needed extra work prior to attempting alignment, and that "the additional work is a situation which was out of the subject contract and contractor's control." (*Id.*, Pl. Ex. 2-K.) PEC then requested, and was granted, a two week extension because of difficulties in aligning the Units. (Def. Br. 12.)

PEC sought a modification for $15,000 for modifications to the Unit 2 turbine housing. (*Id.*) Again, there is dispute as to whether this modification was accepted, but there is nothing signed by the City approving the changes.

Unit 2 alignment continued into early June. On May 19, 2005, Slate requested a memorandum for any disputed work for which compensation was being requested, including "very simple one or two sentence descriptions or only enough to convey the general details of each scope." (Pl. Opp. 19.) PEC submitted this to Slate on May 25, 2005, while there was still work to do on Unit 2. (*Id.*) PEC was asked to submit more documentation. On July 29, 2005 PEC sent invoices for its work to Danville. (*Id.* at 20.) Danville requested documentation that the disputed work was outside the scope of the contract and that a written amendment had been

4

issued. (Def. Br. 13–14.) PEC could not, and did not, supply this documentation. (*Id.*)

Danville representatives and Brad Child of PEC met in November to discuss the claims. (*Id.* at 14.) Danville paid $52,902 of the balance. (*Id.*) The remaining claims are: Unit 1 alignment work ($58,665) and redoweling ($2,120), Unit 2 alignment work ($86,825), relocating a stator ($3,000), and redoweling ($2,120), and Unit 3 alignment ($71,295, including concrete repair work) and redoweling ($2,120). (*Id.* at 14–15.) Thus the total claims are $226,145 for the disputed work, of which $216,785 is for alignment of the Units. (*Id.*)

## II.   PROCEDURAL BACKGROUND

PEC filed its Complaint [1] on December 28, 2006. The Complaint first claims breach of contract, alleging that at the request of authorized representatives of Danville, PEC performed the disputed work and was not paid for such work. (Compl. ¶ 8.) Further, Danville, by representation, statement, and/or conduct, has waived any requirement that change orders for necessary additional work be agreed to by Danville. (Compl. ¶ 9.) Alternatively, PEC urges that the agreement to do the Disputed Work constituted an independent contract. (Compl. ¶ 10.)

PEC's second claimed cause of action is *quantum meruit*. The additional necessary work that was required involved the alignment of the generator and turbine shaft to the existing fixed position of the nozzles of the water wheel and other items. (Compl. ¶ 16.) Danville and its agents agreed that the work was essential and should be performed. (Compl. ¶ 17.) The work increased the value of the plant by $250,000, and Danville had knowledge of the benefit. (Compl. ¶¶ 18–20.) PEC had an expectation that it would get paid and Danville should have expected to pay for the work. (Compl. ¶ 21.)

On January 25, 2008, Danville filed the Motion [25] presently at issue and a Brief in Support of this Motion [26]. Danville sets out its argument in five parts. First, PEC was

required to perform most, if not all, of the Disputed Work under the "Unit Alignment" subsection of the Contract. (Def. Br. 16.) Further, Danville points out that PEC was required to inspect the Units and that Danville did not warrant that the existing conditions encountered would be the same as those in the original documentation. (*Id.* at 19.) This is PEC's liability since Article 8.e of the Contract placed responsibility for unexpected conditions on PEC. (*Id.*)

Second, even if the Disputed Work was extra, PEC was required to submit written amendments and get approval. (*Id.* at 20.) Article 7 of the Contract requires all increases in the contract price to be made in writing and be signed by a Danville official.

Third, there is no separate contract for the work. (*Id.* at 26.) Virginia Code requires competitive sealed bidding or competitive negotiation for new contracts. VA. CODE ANN. § 2.2-4303(A) (2005). Because this did not occur, PEC can not claim that a new contract existed here.

Fourth, *quantum meruit* does not apply because there is a contract which establishes the rights and obligations of the parties. (Def. Br. 27.) The Contract relates to disassembly, reassembly, and alignment of the Units. (*Id.* at 28.) PEC's claim relates to alignment work it performed while reassembling the generators. (*Id.*) It does not matter if it was extra work that was not required, because the contract required a process for amendment.

Fifth, even if the Disputed Work is extra, Virginia and Danville Codes expressly limit the amount that PEC may recover. (*Id.* at 29.) Specifically, the Virginia Public Procurement Act ("VPPA") provides that a fixed-price contract may not be increased by amendment by more than $50,000 or twenty-five percent of the contract, whichever is more.

PEC timely filed its Brief in Opposition [29]. PEC argues first that where work is related to work required under an express contract, but is entirely different in subject matter and scope and is not itself required, recovery for the new work is available under *quantum meruit*. (Pl.

6

Opp. 24–29.) PEC also disputes Danville's claim that the Virginia Code limits its recovery here. (*Id.* at 29.)

Next, PEC states that it is entitled to receive compensation under the Contract. (*Id.* at 36.) Though Article 7 of the Contract provides that no increase be made without written agreement, it provides no time limit for this. (*Id.*) Here, PEC provided notice to Danville through its progress minutes, e-mails, and status updates. (*Id.* at 37.) PEC urges that whether this is sufficient notice is an issue for a jury. (*Id.*)

Next, PEC asserts that Danville's conduct resulted in a modification of the notice requirement of the Contract. (*Id.* at 40.) Further, Danville's actions, in authorizing additional work, instructing PEC to proceed with such work, and paying for a portion of that work without requiring strict compliance with the terms of the Contract resulted in Danville's waiver of its ability to later seek strict compliance with those terms. (*Id.* at 45.)

Danville filed its Reply Memorandum [30] on March 4, 2008. This memorandum mostly restates the points raised in the original brief. With regard to PEC's assertion that Danville's conduct or statements removed the need for written approval of additional work, Danville argues that Via, the Director of Purchasing, was the only one authorized to modify the Contract or otherwise bind Danville. (Def. Reply Br. 15.) Modification must be shown though "clear, unequivocal and convincing evidence" of the intent to modify. (*Id.* at 17.) Danville urges that PEC cannot meet the required standard.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Federal Rule of Civil Procedure 56(c). The court must view the facts and the inferences to be drawn from them in the

7

light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654,655 (1962). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**III.    DISCUSSION**

Initially, Danville argues that the disputed work is provided for in the Contract, specifically in the Unit Alignment subparagraph, § 3.4.4. It is true, as Danville suggests, that this subsection is more informative of the work requirements than the language from the disassembly section relied on by PEC. However, as PEC points out, the Unit Alignment subsection only covers runout at the guide bearings and couplings, static shaft runout, shaft plumb, and guide bearing concentricity. The subsection does not cover every conceivable alignment. Therefore, with the facts taken in the light most favorable to PEC, the Contract can not be said to explicitly cover the disputed work.

This analysis does not change simply because PEC assumed most of the risk. Specifically, Article 8.e of the Contract states that PEC "shall bear all losses resulting from the amount or character of the work being different." If, as PEC urges, the disputed work was not contemplated by the Contract, then that work does not come about simply from a change in amount or character of the work delineated by the Contract.

Article 7 of the Contract does, however, require all increases in the contract price to be made in writing and be signed by an authorized City official. Danville cites opinions by Judge Michael in *Service Steel Erectors Co. v. SCE, Inc.*, 573 F.Supp. 177 (W.D. Va. 1983) and *Perry Engineering Co., Inc. v. AT&T Comm., Inc.*, 1992 WL 201944 (W.D. Va. 1992), which both endorse provisions requiring approved change orders.

8

In *Service Steel*, the subcontractor alleged that it was required to do work that was not in the contract. 573 F.Supp. at 178. The contract provided that an authorized written order of the contractor was required for any extra work to be compensable, and that claims must be made within seven days after the cost is incurred. *Id.* Quoting *Atlantic & Danville Ry. v. Delaware Constr. Co.*, 37 S.E. 13, 16 (1900), the opinion states:

> An obvious purpose of such a provision is to avoid subsequent disagreement, and prevent just such a controversy as has arisen in this case… All are aware of the frequency with which it happens in the construction of buildings and other improvements that claims are made for alleged extra work, which give rise to disputes and litigation. Such a provision is a wise, and not an unusual, one in building contracts, and it is held by the authorities to be obligatory upon the parties, and not to be disregarded.

*Id.*

Service Steel attempts to skirt its failure to comply with the contract by alleging that the requirements were waived. *Id.* at 178–79. The contract itself specified the requirements for waiver, which were not met. *Id.* at 179. Further, waiver requires clear and unmistakable evidence, which did not exist because SCE took no steps to abandon its contractual rights and did not agree to pay for such work. *Id.* at 180.

*Perry Engineering* involved a loss to Perry Engineering when AT&T instructed it to bury a cable at only 24 inches deep instead of 44 inches (the loss was because Perry Engineering was paid by the amount of dirt moved). 1992 WL 201944 at *1. The court found that the "work conditions" provision, which addressed which party bore the risk of incorrect estimates, was inapplicable to a dispute over a change in depth. *Id.* at *3. However, a second provision, which stated that no payment for changes was to be made unless authorized in writing, was upheld and barred recovery. *Id.* at *4. Though the ongoing nature of the change in the depth of the trenching may justify going beyond the stated contractual number of days, the large amount of money involved provided a heavy obligation to inform AT&T of the increased costs. *Id.* at *5.

9

Several other cases cited by Danville, including *Main v. Dep't of Highways*, 206 Va. 143 (1965) and *Kirk Reid Company v. Fine*, 205 Va. 778 (1965), reiterate this same proposition – where there is a method under the contract by which a party can insure the recovery of the cost of extra work, that party is not entitled to recovery where it fails to follow that method. This is a sound and logical rule.

By virtue of the plain terms of the Contract, PEC was required to give notice of a claim at the beginning of the work and to receive a written change order from Danville. It is undisputed that PEC did not obtain a written change order. PEC instead argues that 1) it provided notice to Danville through its progress minutes, e-mails, and status updates, and 2) that Danville's actions, in authorizing additional work, instructing PEC to proceed with such work, and paying for a portion of that work without requiring strict compliance with the terms of the Contract, resulted in Danville's waiver of its ability to later seek strict compliance with those terms.

None of the progress reports, e-mails, or status updates submitted to me demonstrate that Danville was on notice of a possible significant extra charge. As Danville states in the Reply Brief: "PEC may have indicated that certain "alignment moves" were outside of the Contract's scope; however written notice of this assertion was never forwarded to the City's appropriate designee." See PEC Exhibit 2-1.

PEC was aware that Gary Via, the Director of Purchasing, was the only person with authority to modify the Contract or otherwise bind Danville. PEC relies on a fax from Wenckus to Gary Via sent on May 6, 2005, which explained the alignment work and stated: "The additional work is a situation which was out of the subject contract and contractors control. While [PEC] is doing everything in its power to expedite the situation, it will require more contract time. Therefore it is requested the end date for [the Contract] be extended by two

calendar weeks." Notably, the request was for two extra weeks but made no mention of additional cost. Danville, through Gary Via, was not sufficiently put on notice through this communication.

Further, no facts have been produced to demonstrate that Danville waived its rights. Though Via did eventually pay for some of the extra work, this was well after the disputed work was undertaken, and could not have modified the Contract in hindsight. PEC also claims in its brief that it repeatedly sought authorization from Danville and that PEC was told just to continue working, but no evidence of these sought authorizations has been submitted. Contrary to PEC's assertion of waiver, at around the same time that the disputed work was occurring, several other proposals were submitted by PEC. (See Def. Br. 12–13.)

Such mutual intention to modify or waive provisions in the contract must be shown by "clear, unequivocal and convincing evidence." *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 73 (1983). I can see no way in which PEC has satisfied this burden.

PEC attempts to analogize the conduct of the parties to that in *Cardinal Development Company v. Stanley Construction Company*, 255 Va. 300 (1998). In that case, Cardinal was found to have breached its contract by failing to pay for extra work, which was not included in the fixed-sum contract. *Id.* at 302. The work was modified because the project originally called for only forty-two lots but was expanded to sixty-two lots. *Id.* at 303. The owners of the property were instructed on the differences and authorized the progress. *Id.* at 303–04. No such facts exist here. The authorized representative of Danville, the Director of Purchasing, was not involved in this nature. *Reid v. Boyle*, 259 Va. 356 (2000), also cited by PEC, suffers from this same flaw.

PEC next suggests that, in the alternative, a separate contract exists. PEC does not

11

reiterate this proposition in its Brief in Opposition, and there is little merit to the suggestion that the requirements of a contract, including a meeting of the minds, are satisfied here.

PEC's second cause of action is unjust enrichment or *quantum meruit*. "To establish a right to relief on [quantum meruit] under Virginia law, the claimant must show that (i) he rendered valuable services, (ii) to the defendant, (iii) which were requested and accepted by the defendant, (iv) under such circumstances as reasonably notified the defendant that the claimant, in performing the work, expected to be paid by the defendant." *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th Cir. 1992).

It is a "well settled" rule that "one cannot obtain *quantum meruit* relief from another if he has expressly delineated the contractual obligations the two will have on the subject matter in question." *Id.* PEC agrees with this contention to the extent that the Contract "specifically covers the exact subject matter for which a party also seeks recovery under *quantum meruit*." (Pl. Opp. 27.) This rule must be understood within the context of the test for *quantum meruit* relief established above. In order for a defendant to be reasonably notified that extra payment is to be expected, the extra work must fall sufficiently outside of the contract. Further, this must be reasonably known to a party with authority to bind the defendant.

On the facts here, even in the light most favorable to PEC, the fourth requirement is not satisfied. As discussed above, Danville, embodied by Gary Via, was not on notice that it would be expected to pay extra for the disputed work. None of the cases cited by PEC negate this determination. In *Davis Brothers Construction Co. v. City of Richmond*, 2006 Va. Cir. LEXIS 163 (City of Richmond May 10, 2006) there was no question that the work was extra, that everyone involved knew the work was extra, and that everyone knew it was being completed. This is the same result in *Campbell County v. Howard*, 133 Va. 19 (1922), and *Worley Brothers*

12

*Co. v. Marus Marble & Tile Co.*, 209 Va. 136 (1968).  In all of these cases, the person responsible for binding the party was on notice.

*Main v. Dep't of Highways*, 206 Va. 143 (1965) seems most on point.  There, the plaintiff alleged that they met with representatives of the Highway Department at the site and by mutual consent agreed to the necessary changes.  *Id.* at 151–52.  The court responded:

> The statutes clearly set forth the manner in which contracts for the construction of state highways may be entered into.  They provide for the advertising and acceptance of bids for such work and the entering into of written contracts with respect thereto.  When the specification for such work have been promulgated and advertised they cannot be changed or waived by subordinate employees of the Department of Highways.  Thus, we cannot agree that a contractor and subordinate employees of the Department of Highways may enter into an oral agreement for the modification of a formal written contract, entered into in the manner provided by law, and place upon the State an added obligation of more than $500,000.  After all, the claim of the plaintiffs here is the recovery of extra work done by them.  As has been said, the written contract which the plaintiffs executed clearly provided the method by which they could insure the recovery of the cost of such extra work, and not having followed the prescribed method, they are not entitled to recovery.

*Id.* at 152.  Therefore, the proper rule is that, especially where the claimant knows of authorized persons to bind the opposing party into a contract, circumstances must exist that reasonably notified the party authorized to bind the defendant that the claimant, in performing the work, expected to be paid by the defendant.  Here that person was Gary Via, the Director of Purchasing.  PEC knew of this fact, but failed to put him on notice as to the extra costs.

I find, therefore, that *quantum meruit* relief is unavailable to PEC.

The parties have not sufficiently briefed the issue of the remaining disputed claims, including the $3,000 charge for relocating the stator or the $6,360 owed for redoweling.  These claims therefore will survive this summary judgment motion.

Because I will dismiss the majority of the claimed damages, the question of whether the

13

Case 4:06-cv-00080-JLK-mfu   Document 32   Filed 04/04/08   Page 13 of 14   Pageid#: 910

Virginia Public Procurement Act limits the damages in this case is moot. I therefore refuse to reach a conclusion on that issue.

## IV. CONCLUSION

For the reasons stated herein, the Motion for Summary Judgment will be GRANTED in part, leaving $9,360 in potential damages. In the end, PEC's representatives simply failed to take the steps required of them to assure that PEC received compensation for their work.

Entered this 4th day of April, 2008.

s/Jackson L. Kiser<br>
Senior United States District Judge